UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| UNITED STATES OF AMERICA | * | CRIMINAL NUMBER 11-0012 |
|---|---|---|
| VERSUS | * | JUDGE ROBERT G. JAMES |
| SHONDOLYN ROCHELLE BLEVINS | * | MAG. JUDGE KAREN L. HAYES |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 18] filed by defendant Shondolyn Rochelle Blevins. For reasons stated below, it is recommended that the motion be **GRANTED IN PART and DENIED IN PART.**

On October 12, 2010, Louisiana State Trooper Chris Hollingsworth, with the assistance of six other officers, executed an arrest warrant for Shondolyn Blevins at her residence, located at 1901 Conover Street, Monroe, Louisiana. In the course of, and in the aftermath of the arrest, the troopers uncovered various quantities of crack cocaine and a loaded firearm in the residence. Later at the station house, Blevins confessed to possessing and selling crack cocaine and possession of the firearm.

On January 26, 2011, a federal grand jury returned a three count indictment against Shondolyn Blevins for possession with intent to distribute crack cocaine, possession of a firearm in furtherance of drug trafficking, and felon in possession of a firearm in violation of 21 U.S.C. §§ 814(a)(1) & (b)(1)(B) and 18 U.S.C. §§ 924(c)(1)(A) & 9223(g)(1). The indictment also seeks forfeiture of the firearm and ammunition. On March 18, 2011, Blevins, via counsel, filed

the instant motion to suppress any evidence seized from her home and any statements that she made while in custody, in response to questioning by law enforcement officers. Following delays for briefing, supplemental briefing, and an April 4, 2011, evidentiary hearing, the matter is now before the court.

## Hearing Testimony

The following facts were established via testimony presented at the April 4, 2011, hearing held in this matter. Testimony was provided exclusively by law enforcement officers.

In August-September 2010, Louisiana State Police Trooper Chris Hollingsworth, in conjunction with other law enforcement officers, investigated Shondolyn Blevins for suspicion of distribution of crack cocaine. During the probe, Trooper Hollingsworth employed a confidential informant to make controlled purchases of illicit narcotics from Blevins. One of the controlled buys occurred at Blevins' residence, with the latest purchase(s) transpiring at the end of September. On October 7, 2010, Hollingsworth successfully applied to a state court judge for a warrant for Blevins' arrest.[1] He did not obtain a search warrant.

After he obtained the arrest warrant, Hollingsworth formed a seven person team to effect Blevins' arrest. The team members included Hollingsworth, Debbie Gibson, Michael Reichardt, Chris Jordon, Sergeant Cuenca, Sergeant Porter, and Steve Wallace. Before executing the warrant, Hollingsworth and his team knew that Blevins had prior drug and weapon convictions. Hollingsworth also learned that Blevins had threatened to kill someone in June 2010, and that she possessed a firearm.

Hollingsworth and his team executed the arrest warrant on October 12, 2010, at

---

[1] The government did not produce a copy of the warrant. The testimony, however, remains uncontroverted. Moreover, it is defendant's burden to demonstrate the invalidity of the warrant. *United States v. Munoz*, 150 F.3d 401, 412 n7 (5th Cir. 1998).

approximately 7:15 a.m., at Blevins' residence – a roughly 18' by 45' mobile home, located at 1901 Conover Street, Monroe, Louisiana. They did not know for certain whether Blevins was home. The troopers were clad in black raid vests, emblazoned with "State Police." The troopers' torsos also displayed "State Police" patches on their sides and back.

Trooper Hollingsworth approached the front door of the residence from the left side, while Trooper Gibson stood by the right side. There were five troopers stationed in the front of the residence and two in the back. Their service weapons were drawn, but held down by their legs. Hollingsworth walked up the steps, knocked on the door, and then stepped back onto the ground. A few seconds later, the door started to open, and someone from inside asked "who is it?" Hollingsworth loudly replied, "State Police." Hollingsworth and Gibson observed that Blevins had opened the door. As soon as Blevins saw the troopers, she turned and ran inside.

Trooper Gibson advised Hollingsworth that Blevins was running. Blevins did not attempt to shut the door. Hollingsworth heard Blevins take several steps and then a loud "thump." The troopers pursued Blevins inside and ordered her to stop. Gibson commanded, "Let me see your hands . . . Let me see your hands . . . Get on the ground!" Blevins quickly complied and lay down on the floor. She only took four to five steps before the troopers apprehended her.[2] The troopers observed a Lorcin 380 pistol lying on the floor, approximately five to six steps in front of Blevins.

At the hearing, Hollingsworth explained that the front entrance to Blevins' mobile home opened up into the kitchen area. The stove is situated directly in front of the doorway. Also, a half-wall countertop acts as a divider between the kitchen and living room. Upon entry, the living room is situated approximately two steps away to the left. There was a mattress on the

---

[2] Trooper Gibson testified that Blevins took about 15 steps before she went to the floor.

floor of the living room, and a small table beside it.

While Blevins was still on the floor, Hollingsworth placed her under arrest and advised her of unspecified *Miranda* rights. *See* discussion, *infra*. Blevins replied that she understood her rights. Hollingsworth asked Blevins if anyone else was in the home, and whether she had any narcotics in the residence. Blevins denied that anyone else was there, but admitted that "there was crack hidden all over the house."

While Hollingsworth was busy handcuffing Blevins, Trooper Jordon and another team member proceeded to the rear of the trailer to ensure that no one else was present; i.e., they conducted a protective sweep. There were five team members in the trailer, with weapons drawn.[3] Once they concluded the protective sweep, all team members returned to the living room area.

After Hollingsworth handcuffed Blevins and advised her of her rights, he stood her up, and offered her a pair of pants because she was wearing underclothes from the waist down. Hollingsworth permitted Blevins to dress before he solicited her permission to search the residence. He also read Blevins a "rights form," but she declined to sign the form. Hollingsworth replied, "Well, you don't have to sign the form." Blevins then explained, "[w]ell, I'm not going to sign the form but you can search and look wherever you want to."[4]

At that point, Trooper Wallace, who had been standing in the main area of the living room and kitchen, turned and pointed towards the stove, exclaiming, "[t]here's a crack rock right

---

[3] Trooper Cuenca testified that his weapon was not drawn when he entered the trailer.

[4] Trooper Gibson did not hear Trooper Hollingsworth ask Blevins for consent to search. Thus, she surmised that he obtained consent while the other troopers were still clearing the trailer. However, Hollingsworth testified that the other troopers had finished the protective sweep and returned to the living room *before* he sought Blevins' consent. Nonetheless, Trooper Cuenca heard Blevins convey her consent to search the residence.

4

there." Hollingsworth also observed an open medicine bottle with 157 rocks of crack cocaine sitting on the half-wall countertop that separated the living room from the kitchen. He further spotted, in plain view, a couple of bags of suspected marijuana lying on the bed, and a partially smoked marijuana cigar in an ashtray.

After obtaining consent to search, the first object that Hollingsworth inspected was a red ceramic heart that was next to the open medicine bottle. Hollingsworth removed the lid to the heart, and discovered another 47 rocks of cocaine. After the troopers located the crack cocaine in the ceramic heart, they discovered an extra magazine for the Lorcin 380 with five rounds of ammunition in it, lying on the bedside table. Immediately thereafter, Hollingsworth, Gibson, and Sergeant Porter transported Blevins to the Monroe field office. The search lasted approximately ten minutes.

Blevins did not retract her consent to search, or otherwise attempt to stop the search. She was cordial and cooperative throughout this period. After Blevins departed, the remaining troopers conducted a more thorough search of the premises that lasted as long as one hour. They photographed and labeled the evidence. There is no indication that this subsequent search uncovered any additional evidence.

At the Monroe field office, the troopers presented Blevins with a statement of rights form that set forth the several cautionary instructions required by *Miranda v. Arizona*. (Statement of Rights, Gov.'t Resp., Exh.).[5] Blevins checked and initialed boxes on the form, indicating that she understood her rights and that she agreed to answer questions. *Id*. She also signed the form. *Id*. During the ensuing interview, Blevins admitted that she possessed and sold the crack

---

[5] The government did not introduce the statement of rights form into evidence at the hearing. Instead, it submitted a copy of the statement of rights form as an attachment to a post-hearing supplemental brief, without any ensuing objection.

cocaine. She further admitted that she possessed the Lorcin pistol. The state police did not record the interview. Hollingsworth testified that throughout the questioning, Blevins did not appear impaired. She also seemed to understand and comprehend the questions that the troopers posed to her.

## Law and Analysis

I.     **The Officers Permissibly Entered Defendant's Residence to Effect Her Arrest**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when a law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *accord United States v. Munoz-Guerra*, 788 F.2d 295, 297 (5th Cir. 1986). For Fourth Amendment purposes, however, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is *reason to believe* the suspect is within." *Payton v. New York*, 445 U.S. 573, 602-603, 100 S.Ct. 1371, 1388 (1980) (emphasis added).[6]

---

[6] The Supreme Court explained that,
 [i]t is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a

6

Blevins does not contest that the state police obtained a warrant for her arrest, supported by probable cause. Rather, she contends that the state police did not have "reason to believe" that she would be at home at the date and time that they sought to execute the warrant. In *United States v. Woods*, however, the Fifth Circuit recognized that law enforcement officers may reasonably anticipate that the subject of an arrest warrant will be at her "place of abode, especially at 8:30 in the morning for a [person] not known to be working . . ." *United States v. Woods*, 560 F.2d 660, 665 (5th Cir. 1977).[7] Here, the state police sought to execute the arrest warrant at the address where they had cause to believe that Blevins resided (and from where they had observed her consummate a controlled substance transaction(s)), at a time outside of ordinary working hours when she was likely to be at home.

The court further observes that upon arrival at Blevins' trailer, the officers did not proceed to break down Blevins' front door, or otherwise burst into her residence unannounced. Rather, they walked up the steps and knocked on the door. "[W]hen an officer of the law simply walks up to the door and knocks, (s)he visits the house in the same lawful way that a private citizen would, and the ensuing 'knock and talk' does not implicate the Fourth Amendment or its exceptions because no search or seizure occurs." *United States v. Walters*, No. 1:06-CR-149, 2007 U.S. Dist. LEXIS 96267, at *20 (E.D. Tex. Oct. 10, 2007), *adopted by* 529 F. Supp. 2d 628, (E.D. Tex. 2007) (citing *United States v. Thomas*, 120 F.3d 564, 571 (5th Cir. 1997)).

The troopers did not enter the residence until Blevins opened the door and after they

---

judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.

*Id*.

[7] Although *Woods* pre-dates the Supreme Court's decision in *Payton*, the Fifth Circuit adheres to *Woods*' articulation of the "reasonable belief" test. *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997).

observed her. Moreover, Blevins did not remain in the doorway or exit the trailer to discuss the matter with the officers; she turned and hastily retreated inside, apparently discarding a loaded firearm in the process. The Fourth Amendment's protections regarding the sanctity of the home do not extend to these circumstances. *See Payton, supra*. Accordingly, the officers permissibly entered Blevins' home to effect her arrest.

## II. Blevins' Initial, Post-Arrest, Un-Mirandized Statement is Inadmissible at Trial and Must Be Suppressed

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself . . ." U.S. CONST. AMEND. V. In *Miranda v. Arizona*, the Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) (footnote omitted). The central principle established by *Miranda* is that if the police question an in-custody suspect without informing her of the rights specified therein, then her responses cannot be introduced into evidence to establish her guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144 (1984). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting waiver has generally produced a virtual ticket of admissibility . .

8

." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 2608 (2004) (footnote omitted).

The government must establish by a preponderance of the evidence the voluntariness of an incriminating statement and the *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515 (1986), *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619 (1972). "A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir.1996). To establish that a confession was involuntary, a defendant must show a causal connection between the confession and coercive police conduct. *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004) (citation omitted).

As discussed earlier, Trooper Hollingsworth placed Blevins under arrest as soon as the troopers apprehended her inside of the residence. At that point, Blevins was "in custody" for purposes of *Miranda*. *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) (citations omitted) (suspect is in custody, *inter alia*, when officers place her under formal arrest). Hollingsworth then "read" Blevins her *Miranda* rights, which she said she understood. (Hearing Transcript, pg. 7). The government, however, did not present any evidence at the hearing regarding the specific *Miranda* cautions that Hollingsworth read to Blevins.

In her post-hearing memorandum, defendant exploits the lack of evidence that "Trooper Hollingsworth correctly administered the rights warning." (Def. Post-Hearing Memo., pg. 5). She adds that the record, at least as it existed at the time she filed her latest brief, also did not contain the "statement of rights" form that she purportedly signed at the Monroe field office. Defendant's argument is supported by *Moll v. United States*, where the Fifth Circuit stated that

> [w]hile there was testimony that the police officers read to appellant a card concerning his rights, the evidence does not demonstrate that a constitutionally adequate warning was given. The government's burden may not be met by presumptions or inferences that when police officers read to an accused from a

9

> card they are reading Miranda warnings or that what is read, without revelation of
> its contents, meets constitutional standards.

*Moll v. United States*, 413 F.2d 1233, 1237-38 (5th Cir. 1969).

Because defendant did not explicitly question the sufficiency of the *Miranda* warnings until her post-hearing brief,[8] the undersigned quoted the foregoing language from *Moll v. United States*, and directed the government to file a supplemental memorandum, addressing the foregoing "argument and authority." (May 16, 2011, Order).

On May 21, 2011, the government responded to the court's directive, and submitted a copy of the statement of rights form signed by Blevins at the Monroe field office. (Statement of Rights; Gov.'t Resp., Exh.). The government did not dispute that it must demonstrate by a preponderance of the evidence that the officers properly Mirandized Blevins. (Gov.'t Resp., pg. 4). Nevertheless, the government emphasized, that Blevins never alleged that Hollingsworth omitted any particular warning, and that if she had done so, then it would have elicited the requisite testimony at the hearing. *Id*. The government further argued that when a law enforcement officer refers to *Miranda* rights, he necessarily refers to all of the rights imposed by *Miranda v. Arizona*. *Id*.

The latter argument, however, appears to conflict with the Fifth Circuit's decision in *Moll*. Without directly addressing *Moll*, or citing to any superceding case law, the government seems to suggest that *Moll* has been undermined by the passage of time. Yet, as recently as 2008, the Eleventh Circuit took pains to distinguish *Moll*. *See United States v. Wright*, 300 Fed. Appx. 627, *4-5 (11th Cir. Nov. 12, 2008) (unpubl.).[9]

---

[8] Albeit, Blevins argued in her motion to suppress that the government must show that she was Mirandized and that there was a valid *Miranda* waiver. (M/Suppress, Memo., pg. 2).

[9] In *Wright*, the government adduced additional testimony regarding the completeness of the *Miranda* warnings. *Id*. Further, defendant did not challenge the sufficiency of the warnings

10

To the extent that the government was caught unawares by Blevins' challenge to the sufficiency of the *Miranda* warnings, the court afforded the government an opportunity to reply. In response, the government adduced evidence establishing the sufficiency of the Miranda warnings that Blevins received prior to subsequent questioning at the Monroe station house. However, it did not take any steps to shore up the unspecified *Miranda* rights that Hollingsworth read to Blevins at the time of arrest. In the absence of this evidence, the undersigned is compelled to find that Blevins did not initially receive requisite *Miranda* warnings, thus invalidating her attempted waiver of her right against self-incrimination. *See Moll, supra*. Accordingly, her statement that there was "crack hidden all over the house" is inadmissible at trial and must be suppressed.

**III.    The Initial Miranda Violation Does Not Per Se Taint the Physical Evidence or Blevins' Later Confession**

In *United States v. Patane*, the Supreme Court observed that

> police do not violate a suspect's constitutional rights (or the Miranda rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by Miranda. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, [t]he exclusion of unwarned statements . . . **is a complete and sufficient remedy for any perceived Miranda violation**.

*United States v. Patane*, 542 U.S. 630, 641-642, 124 S.Ct. 2620, 2628 -2629 (2004) (citation and internal quotation marks omitted) (emphasis added).

Consequently, a mere failure to warn does not compel application of the "fruit of the poisonous tree" doctrine. *Id.*, *see also United States v. Brathwaite*, 458 F.3d 376, 382 n7 (5th Cir. 2006) (district court properly declined to suppress physical evidence, despite officer questioning defendant prior to giving him *Miranda* warnings); *United States v. Mendez*, 27 F.3d 126, 130 (5th

---

until *after* the district court had decided the motion to suppress. *Id*.

Cir. 1994) ("A mere violation of Miranda's 'prophylactic' procedures does not trigger the fruit of the poisonous tree doctrine."). To suppress derivative evidence, "the tactics employed by the officers must be so offensive to a civilized system of justice that they must be condemned." *Mendez, supra* (citation and internal quotation marks omitted). In the instant case, there is no evidence of offensive tactics by the officers.

Furthermore, an officer's failure to provide *Miranda* warnings before seeking consent to search does not prohibit the use of defendant's statements granting consent to search. *United States v. Stevens*, 487 F.3d 232, 242-243 (5th Cir. 2007) (citations omitted). "Instead, the fact that Miranda warnings were not given will simply be a factor to consider under the voluntariness test." *Id.* (citation and internal quotation marks omitted); *see* discussion, *infra*.

In addition, Blevins' subsequent incriminatory admissions made after she was properly Mirandized at the station house are admissible when, as here, there is no evidence of coercion and the officers did not deliberately follow a two-step strategy to obtain the inculpatory statements. *See United States v. Nunez-Sanchez*, 478 F.3d 663, 667-669 (5th Cir. 2007) (distinguishing between *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601 (2004) and *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285 (1985)). "In cases such as this, [a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* (citation and internal quotation marks omitted).

The uncontroverted evidence establishes that the state police properly administered Miranda warnings to Blevins before she provided her incriminating statements at the station house. There is no evidence of coercion by the officers; Blevins remained cordial and cooperative throughout. *See United States v. Mendez*, 102 F.3d 126, 131 (5th Cir. 1996) (citation

omitted) (because defendant did not testify at the suppression hearing there was no evidence that his actions were coerced, uninformed, or otherwise involuntary).

IV. **The Officers Seized the Firearm and Contraband Pursuant to Valid Exceptions to the Search Warrant Requirement**

"Warrantless searches and seizures inside a home are presumptively unreasonable . . ." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010), *cert. denied*, __ U.S. __, 131 S.Ct. 158 (2010) (citations and internal quotation marks omitted). Nonetheless, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id*. To meet this exception, the government must establish (1) effective consent, (2) that was given voluntarily, (3) by a party with actual or apparent authority." *Id*.

Defendant contends that the first two elements are absent here.[10] Blevins argues that she did not effectively consent to the search because she refused to sign a written consent form presented by the officers. Trooper Hollingsworth, however, testified that Blevins verbally articulated her consent to search the residence even after she declined to sign the form. The court credits Hollingsworth's testimony and finds that Blevins validly consented to the search of her residence. *See United States v. Stevens*, 487 F.3d 232, 240-41 (5th Cir. 2007) (valid consent where defendant told agent, "[y]ou can search the house, but I'm not signing anything"); *United States v. Garner*, 1997 WL 420227, *1 (5th Cir. July 1, 1997) (unpubl.) (valid verbal consent despite defendant's refusal to sign consent form).[11]

---

[10] Blevins does not contest that she had actual or apparent authority to confer consent.

[11] To the extent that Trooper Gibson's testimony conflicts with Trooper Hollingsworth's version of events, the court resolves the inconsistency in favor of Hollingsworth's recollection, because he personally obtained the consent. Furthermore, Trooper Cuenca heard Blevins convey her consent to search the home.

13

Defendant next argues that she did not voluntarily consent to the search. Voluntariness of consent is determined by the totality of the circumstances, comprised of six factors:

(1) the voluntariness of the defendant's custodial status;

(2) the presence of coercive police procedures;

(3) the extent and level of the defendant's cooperation with the police;

(4) the defendant's awareness of his right to refuse to consent;

(5) the defendant's education and intelligence; and

(6) the defendant's belief that no incriminating evidence will be found.

*United States v. Martinez*, 2011 WL 72195, 2 (5th Cir. Jan. 6, 2011) (unpubl.) (citation and internal quotation marks omitted).

Although all six factors are relevant, no single factor is dispositive. *Id*.

Applying the foregoing considerations here, the court finds that at the time of the consent, Blevins was in handcuffs and under arrest. Thus, the court construes this factor against the government. Second, although there were at least five law enforcement officers in the same room as Blevins at the time she consented to the search, there is no indication that any weapons were pointed at her or that they threatened, or otherwise shouted at her while soliciting her consent. In fact, they permitted her to clothe herself before seeking consent. Moreover, Blevins was cooperating with the police. After Hollingsworth advised Blevins of unspecified "*Miranda* rights," she voluntarily conceded the presence of contraband throughout the house. At the hearing, Hollingsworth described Blevins as "very cordial and very cooperative." Also, Blevins verbally consented to the search in surroundings familiar to her. *See United States v. Riley*, 968 F.2d 422, 426-427 (5th Cir. 1992).

The record also contains some evidence that Blevins was aware of her right to withhold consent to search. For instance, Trooper Hollingsworth read Blevins a "rights form," and

explained to her that she did not have to sign the consent form. (Hearing Tr. pgs. 8-9). Blevins elected not to sign the form, but maintained her verbal consent to search the house. It is not clear that she also understood that she had the right to withhold verbal consent. No evidence was adduced at the hearing relative to Blevins' education or intelligence.

Finally, Blevins clearly believed that incriminating evidence would be found because she previously admitted to the officers that crack cocaine was "hidden" all over the house. With the exception of one cache of drugs, however, all of the seized items were "hidden" in plain view, in the living room/kitchen area where Blevins and the officers were congregated. *See* discussion, *infra*. Thus, although this factor technically leans against a finding of voluntariness, it does so nominally. As the Fifth Circuit remarked in *Martinez*, "it would be significantly more likely for a defendant to consent voluntarily to a search that [s]he knew would produce evidence of a crime if [s]he had already voluntarily admitted to committing the crime." *Martinez, supra*.

Upon consideration of the totality of the circumstances, the undersigned finds that Blevins' consent to search was voluntary. *See e.g., United States v. Estrada*, 459 F.3d 627 (5th Cir. 2006) (consent freely given where defendants were calm and cooperative and police did not employ coercive tactics); *United States v. Timoteo*, 353 Fed. Appx. 968, *6 (5th Cir. Dec. 1, 2009) (unpubl.) (arrestee's verbal consent to a limited search was voluntary, where he was very cooperative and despite his refusal to sign written consent).

Furthermore, with the exception of the cocaine found inside of the heart-shaped container, the remaining drugs and firearm were discovered by the officers in plain view. The aptly named "plain view doctrine" authorizes law enforcement to seize evidence in plain view, without a warrant. *United States v. Paige*, 136 F.3d 1012, 1023 (5th Cir. 1998) (citations omitted). Nevertheless, as with most legal principles, application of the doctrine is more detailed

15

than its name would suggest. A plain view seizure presupposes four conditions:

    (1)    the officer conducting the seizure must lawfully arrive at the position from which the object is plainly seen;

    (2)    the object must be in plain view;

    (3)    the object's incriminating character must be immediately apparent- i.e., the officer must have probable cause to believe the object is contraband or evidence of a crime; and

    (4)    the officer must have a lawful right of access to the object itself.

*Paige, supra* (citations omitted).

The foregoing conditions are satisfied here. First, the law enforcement officers were lawfully standing in Blevins' living room/kitchen area after securing her arrest.[12] They readily and openly observed a crack rock on the stove, an open medicine bottle on the counter with rocks of crack cocaine, two bags of marijuana lying on top of the mattress, and a magazine with five rounds of ammunition on a bedside table. The officers earlier recovered Blevins' discarded firearm on the floor, just a few steps away from where they apprehended and arrested her.[13]

The officers also had probable cause to believe that the drugs and ammunition magazine were contraband or evidence of a crime. "Probable cause does not require certainty[,] . . . and in reviewing probable cause determinations, [courts] must consider the totality of the circumstances-including the officers' training and experience as well as their knowledge of the situation at hand." *Paige*, 136 F.3d at 1023-24 (citation omitted). The officers were aware that Blevins had prior drug convictions; thus, she was not permitted to possess a firearm and

---

[12] The protective sweep ended prior to the discovery of the drugs.

[13] The officers also permissibly seized the firearm, incident to Blevins' arrest. *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040 (1969) (police may search area within arrestee's immediate control).

ammunition. Although the government presented no evidence regarding the officers' experience or training,[14] they were aware that Blevins had participated in illegal drug transactions. Blevins herself informed the officers that drugs were located all over the residence. Therefore, under all of the surrounding circumstances, the troopers reasonably believed that the substances they observed were contraband. *See Paige, supra* (officer recognized that he was viewing packaged marijuana); *United States v. Rhodes*, 265 Fed. Appx. 382, 383 (5th Cir. Feb. 15, 2008) (unpubl.) (officers reasonably believed that cocaine base was the substance inside of small bags, which were inside a larger clear plastic bag).

The final requirement for a plain view seizure applies to situations where the law enforcement officer observes and identifies the contraband from a position *outside* of the premises. *See Paige, supra.* Here, however, the troopers were lawfully inside the premises when they observed the seized items. Accordingly, this element of the plain view doctrine is satisfied.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 18] filed by defendant Shondolyn Rochelle Blevins be **GRANTED IN PART**, solely to the extent that the government seeks to introduce at trial defendant's initial admission that "there was crack hidden all over the house."

**IT IS FURTHER RECOMMENDED** that the motion to suppress [doc. # 18] otherwise be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have

---

[14] However, at least two troopers on the scene held the rank of sergeant. Therefore, they likely enjoyed some level of seniority and experience.

**fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 31st day of May 2011.

_____
KAREN L. HAYES
U. S. MAGISTRATE JUDGE